IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| WILLIAM DEXTER WHITE | § | |
| v. | § | CIVIL ACTION NO. 6:05cv26 |
| MAJOR RONALD FOX, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff William Dexter White, an inmate currently confined in the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding. 28 U.S.C. §636(c).

An evidentiary hearing was conducted pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985) on August 18, 2005. At this hearing, White testified that he had been in prison for 17 years, of which 13 had been spent in safekeeping status.[1] He stated that his problems at the Michael Unit began when he received a disciplinary case for extortion in December of 2002.

The basis of this case, White said, was a letter, purportedly written by an inmate named Castillo, to Castillo's attorney. This letter directed the attorney to send $1000.00 to White's father.

White testified that he never got to see the letter, but then indicated that he was shown the letter in September of 2002. White said that the letter was written in February of 2002 and was mailed out at that time, but was returned the next month because the attorney did not have any

---

[1] Safekeeping is a general population housing status in which inmates eat and work with other general population prisoners, but are housed only with other safekeeping inmates. It is normally used for inmates who may be victims of assault, have a history of mental problems, held public office in the free world, or who committed particularly heinous crimes. (Per testimony of Warden Alton Caskey in Johnson v. Collins, docket no. 6:94cv452). White indicated that he was in safekeeping because he had been the victim of assaults in the past.

1

money with which to comply with the request. White did not elaborate on how he was aware of these details, but said that the letter was given to the Michael Unit extortion team.

The disciplinary case was filed against him in December of 2002, White said, some ten months after the letter was written. This disciplinary case says that "on the date and time listed above," and at the extortion office, White attempted to extort $1000.00 from inmate Castillo by sending a typed letter for Castillo to send to his attorney, authorizing the attorney to send the money to White's father.

White contended at the hearing that this disciplinary case was "false." As proof, he pointed to the fact that the case alleged that the extortion had been committed in December of 2002, when in fact the letter was written some ten months earlier, and that Castillo, the person allegedly extorted, was not even on the unit in December of 2002. White also said that the case charged him with "attempted extortion," but that there is no such thing.

Next, White said that he was denied due process in the disciplinary case in that he was not allowed to call witnesses, the notice was inadequate and did not state how he had attempted the extortion, he did not receive copies of the evidence to be used against him as required by <u>Brady v. Maryland</u> nor 24 hours' notice to review this evidence, and he was charged with attempted extortion but found guilty of extortion.

White explains that he wanted to call the attorney to whom the letter was sent, inmate Castillo, and inmate Michael Frost, whom White says could have testified "as to what had happened ten months earlier." He also wanted to introduce the mail log, to show the date the letter was mailed out, the "extortion log," a copy of Castillo's classification file, and a printout showing that Castillo had sent $1,000.00 to another inmate's sister. White argues that there was no evidence to support the charge and complains that at the conclusion of the hearing, he received a copy of the hearing record, but several blanks were not filled in, including the sections giving reasons for the exclusion of witnesses and the reason for the decision. Some 50 days later, he received another copy of the record, but this one had been "altered" by having these blanks filled in.

White contended that Major Fox ordered Lt. Woods to write the disciplinary case in retaliation for his legal activities. He said that he had filed more grievances than any other inmate at the Michael Unit, and that he helped other inmates in safekeeping to file grievances. White added that he had previously filed grievances against Woods for taking some of his property.

White pointed out that he had a letter from Castillo denying that White had extorted him.[2] This letter, which was apparently written on the same kind of typewriter, with the same font, that is used by White in his complaint, has a typed signature line of April 18, but the signature is actually dated April 22, 2003. The letter says that White never extorted him out of any money and that White should not have received a disciplinary case; it says that White is "a good individual" and would not do any type of extortion or threats toward anyone, so he, White, never should have been taken off of protective custody. Castillo indicates that he was on the Hughes Unit at the time that he signed the letter and White testified that Castillo was not at the Michael Unit at the time of the disciplinary hearing; it is thus unclear how Castillo could have known that White was in fact taken off protective custody.

White said that Castillo owed a lot of inmates money, so he, Castillo, was simply trying to get moved off the unit. He did not indicate whether he had written the letter or if Castillo had done so.

As a result of the disciplinary case, White said, he was removed from protective custody and transferred to the Darrington Unit, where he was assaulted by inmate gang members.

White stated that Major Fox told an inmate named Barnes that White had "snitched" on him. He quoted Barnes as saying that Fox had told him that White would be "rewarded" for snitching with a transfer off the Michael Unit. White explained that Warden Vasquez, the warden at the Darrington Unit, had previously been at the Michael Unit where Barnes had worked for him in the craft shop. White stated that "it was known" by unit officials at Darrington that he, White, was regarded as a

---

[2]Despite this, White accuses Castillo of conspiring against him and has named him as a defendant in this lawsuit.

"snitch." When he arrived at Darrington, White said that he asked the unit officials to check the disciplinary case which he had received, so that they could see that it had been falsified, but they refused.

White then went into a lengthy explanation about his encounter with Barnes. He said that Barnes was in pre-hearing detention and began yelling "who's White" and asking why White had snitched on him. White stated that Barnes told him that Lt. Graham had said that he, Graham, knew that Barnes knew White, and that he wanted to know what White was doing; in other words, Graham wanted Barnes to snitch on White.

Barnes received a disciplinary case for having some security keys; White indicated that the Texas Mafia prison gang was involved in some way with this incident. Barnes was then threatened with another case, for lying to an officer, for saying that he did not know White.

Barnes sent White a signed statement saying that on March 5, 2003, Major Fox told him that inmates White and Valentine had written statements against him concerning some security keys, and that he told the major that he did not know either of these inmates.

Returning to his own case, White stated that he was found guilty of extortion on December 30, 2002, and sent to the Darrington Unit in April of 2003. In February of 2003, he said, there was a conspiracy to get his property. He said that Officer Russell told him to go to the shower, and then got a laundry basket and put all of White's property in it. White asked for confiscation papers but Russell refused, saying that Major Fox had told him to get the property. White said that when he came out of the shower, Russell took the shirt and boots that he was wearing.

Eventually, White said, Russell gave him a little property tag showing that Major Fox had ordered his property taken. Most of his property was returned in five or six hours, he said, but there was a trial transcript from his trial missing.

White explained that he was working on his criminal case, even though he acknowledged that he had been convicted in 1990 on a guilty plea. He said that he had previously filed a direct appeal, which was dismissed, and also a state habeas corpus petition, which had been dismissed, and he was

4

now seeking an out-of-time appeal. White stated that his previous direct appeal had also been an out-of-time appeal, but the Ninth Court of Appeals in Beaumont had dismissed it as improvidently granted. White said that although he had waived appeal when he pleaded guilty, this was a "fraudulent document" because it stated that it had been signed in "open court" when it was not, and it said that he understood his rights when he did not. He conceded that he received the punishment which had been agreed to, but insisted that the document was fraudulent, and argued that the Ninth Court of Appeals did not have the authority to grant an out-of-time appeal so the denial of his by that court was improper. White also indicated that he lost some books as well as a list of the names and numbers of inmates whom he had been helping.

White said that he was suing Captain Taylor because Taylor denied him due process in the disciplinary hearing. He said that he wanted to call witnesses to show that Castillo was no longer on the unit, but could not, and that he could not introduce the mail logs or the logs from the extortion team, to show that he did not extort Castillo on December 19, 2002, as the charge alleged. White again complained that the record of the hearing which he received had certain portions missing, and that on February 21, 2003, he received another copy which had these portions filled in. White contended that this second copy had been "altered and falsified." He also said that he was entitled to "Brady" material, but again would not say whether or not he had written the letter to Castillo's attorney.

White said that he sued Ham, his counsel substitute, because she called him "stupid" when he told her that he wanted to call Castillo. At the disciplinary hearing, he told her that he wanted to dismiss her as counsel substitute, but she stayed anyway.

Next, White said that he was suing Beverly Fox, a classification officer, because she recommended his removal from safekeeping based on "false information." He conceded that if the case had been valid, this would have been sufficient reason to remove him from safekeeping.

White said that he was suing Officer Russell because Russell had taken his property on March 3, 2003, without giving him confiscation papers, and that he was suing Warden Thompson

because Thompson presided over the unit classification committee which removed him from safekeeping. He also complained of an incident in which items of property were taken by an officer named Jones on February 18, 2003.

White went on to say that he was suing Anthony Holmes because Holmes "conspired with Major Fox" to confiscate certain legal materials of White's. Specifically, White said, Holmes confiscated a Step One grievance which Barnes had sent to White; he explained that this was a grievance which White was going to file, challenging errors in Barnes' disciplinary conviction. He said that Holmes took the document and gave it to Fox, who called Barnes out and said that White was a snitch. However, White conceded that he eventually did get the copy of the Step One grievance, but maintained that the taking violated "his right to help Barnes."

Next, White complained that James Pate, Pamela Kirkpatrick, and Sharon Different were unit grievance investigators. One or more of these people stole his Step One grievance appeal about his extortion case; however, White said, he eventually got it back, but without copies of documents which he had attached to it. He acknowledged that the grievance was answered, but said that he got a copy of the "altered" disciplinary record when it was.

White next brought up matters which occurred at the Darrington Unit, which is within the territorial jurisdiction of the Southern District of Texas. A substantial portion of White's complaint concerns issues and Defendants located at the Darrington Unit. These matters will be transferred to that Court for any further proceedings which may be appropriate.

Finally, White argued that Texas law recognized a theory of an "ongoing continuous tort." He said that he wanted to amend his complaint to include ongoing violations of his right at the Eastham Unit, under the theory that all of these violations resulted from the fact that he got the extortion case and was removed from safekeeping.

Legal Standards and Analysis

I. The Disciplinary Case

White's primary complaint is to the disciplinary case which he received for extortion, about which he raised a number of allegations. As a general rule, challenges to prison disciplinary cases cannot be brought in Section 1983 cases absent a showing that the disciplinary case has been reversed, set aside, expunged, or otherwise declared invalid by state proceedings or through the issuance of a federal writ of habeas corpus. Edwards v. Balisok, 520 U.S. 641, 644, 117 S.Ct. 1584, 1587 (1997); *see also* Clarke v. Stalder, 154 F.3d 186, 189 (5th Cir. 1988) (*en banc*). White has failed to make such a showing in this case, and so to the extent that he challenges the disciplinary case, his challenge is without merit.

Even absent this fact, it is apparent that White's challenge to the case is without merit. First, White complains that the case is not valid because it alleges that he committed the act on December 19, 2002, at a time when the alleged victim was no longer on the unit and some ten months after the letter was actually sent.

However, White acknowledges that he had notice of when the incident in fact occurred; he testified that the letter had been written ten months earlier, and he noted in his Step One grievance that the letter had been written in February of 2002. Nor does White indicate that his ability to prepare a defense was hindered in any way by the allegation on the charging instrument. Because White had actual notice of the charge against him and does not show that his claimed lack of notice harmed him in any way, his claim on this point is without merit.

White next asserts that he was denied the opportunity to call witnesses, including the attorney to whom the letter was sent and Castillo himself, and the opportunity to offer evidence including the mail logs and the extortion team logs. He states that he wished to call the attorney to show that no money was actually sent, but this is not relevant to the charge that he attempted to extort money by sending the letter to Castillo in the first place. The Fifth Circuit has held that confrontation and cross-examination of witnesses at prison disciplinary proceedings is not constitutionally required,

and prison officials may limit the number of witnesses called without explanation to the prisoner. Houser v. Dretke, 395 F.3d 560, 562 (5th Cir. 2004). There was no abuse of discretion in the failure to call Castillo. *See* Wolff v. McDonnell, 418 U.S. 539, 568 (1974) (decisions regarding confrontation and cross-examination in prison disciplinary proceedings are left to the sound discretion of prison officials).

Nor did White show a constitutional violations in the fact that he was not allowed to offer the mail log, the extortion team log, or Castillo's prison records. He makes no showing that these items are relevant to the charge that he attempted to extort money from Castillo, but simply to the date that he did so. In addition, these items are confidential, and the Fifth Circuit has held that the confidentiality of the data may justify TDCJ's refusal to permit the information to gain general circulation. *See* Smith v. Rabelais, 659 F.2d 539, 544 (5th Cir. 1981) (balancing of "mutual accommodation between institutional needs and objectives and the provisions of the Constitution" shows that prison officials did not abuse their discretion in refusing to provide inmate with specific information requested). Nor does Brady v. Maryland, 373 U.S. 83 (1963), apply in prison disciplinary proceedings, which are not criminal in nature. White's claims on this point is without merit.

Finally, White asserts that there is no such thing as "attempted extortion." This is incorrect; an attempt at extortion can be an offense regardless of its success. *See, e.g.*, U.S. v. Jennings, 195 F.3d 375 (5th Cir. 2002) (defendant convicted of attempted extortion). Under the TDCJ-CID Disciplinary Rules, an attempt is a preparatory offense, and a violation of the rules may consist of engaging in the specified behavior, attempting to engage in that behavior, conspiring to engage in that behavior, or aiding others in engaging in the behavior. *See* TDCJ-CID Disciplinary Rules, sec. XIV. White's claim on this point is without merit.

White also sued his counsel substitute, Ham, in connection with his disciplinary case. The Fifth Circuit has held that counsel substitutes, in their function of representing inmates in

8

disciplinary hearings, are not state actors and thus are not amenable to suit under Section 1983. Banuelos v. McFarland, 41 F.3d 232, 234 (5th Cir. 1995). This claim is without merit.

### II. The Claims Regarding Barnes

White contends that Major Fox told Barnes that he, White, was a "snitch." However, he conceded that no harm came to him as a result of this, and that he has not heard from Barnes in over two years.[3]

In Castellano v. Treon, 79 Fed.Appx. 6 (5th Cir., Oct. 21, 2003) (not selected for publication in the Federal Reporter), the prisoner complained that prison officials were deliberately indifferent to his safety by labeling him as a "snitch" and assigning him to units where this was known. However, he failed to show that he had suffered any harm, so the district court dismissed the claim as frivolous. On appeal, the Fifth Circuit held that the district court had properly dismissed the lawsuit and that the appeal was itself frivolous. Castellano, 79 Fed.Appx. at ---, *citing* Jones v. Greninger, 188 F.3d 322, 326 (5th Cir. 1999). The same situation exists in this case. White's claim on this point is without merit.

White also contends that Holmes and Fox took his legal materials by confiscating a Step One grievance which Barnes sent to him. However, this confiscation did not deny White access to court or to the grievance procedure; he conceded that the grievance involved a challenge to a disciplinary case which Barnes had received.

TDCJ-CID rules prohibit the filing of grievances concerning other individuals' problems. *See* TDCJ-CID Offender Orientation Handbook, April 1997 ed., p. 50. White therefore could not properly file a Step One grievance complaining of errors in Barnes' disciplinary conviction; to the extent that the temporary taking of this Step One form preventing him from filing the grievance, he was not denied access to the grievance procedure. *Cf.* Lewis v. Casey, 116 S.Ct. 2174, 2179-81 (1996) (no right to engage in frivolous litigation). White's claim on this point is without merit.

---

[3]TDCJ records show that at the present time, Barnes is not housed on the same unit where White is located.

III. The Confiscation by Officer Jones

White contends that on February 18, 2003, an officer named Jones came and took his personal property, on orders from Major Fox. In his grievance on this incident, no. 2003121898, White says that after his property was confiscated, he was taken to Eight Building and locked up. Some time later, Jones came and brought him two religious books, his toothbrush and toothpaste, a legal tablet, some deodorant, and his medication. White asked about the rest of his property and was told that this was all that he could have in pre-hearing detention level 3.

On February 26, 2003, Officer Arthur came and gave White three bags of property. However, White said, the handle of his typewriter was broken and he was missing some T-shirts and boxer shorts, shampoo and hair conditioner, shower shoes, white plastic bowls, thermal bottoms, two commissary bags, and a law dictionary. White does not indicate that he lost any legal materials, other than the dictionary, in his grievance, and his pleadings do not show that he suffered any harm from any loss of legal materials in this incident.

The doctrine of Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and Hudson v. Palmer, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See* Caine v. Hardy, 943 F.2d 1406, 1412 (5th Cir. 1991). Three predeprivation conditions must exist before the doctrine can be applied. These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized. Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process. Charbonnet v. Lee, 951 F.2d 638, 642 (5th Cir. 1992), *citing* Zinermon v. Burch, 494 U.S. 113 (1990); Myers v. Klevenhagen, 97 F.3d 91, 94-95 (5th Cir. 1996).

Hudson holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state

post-deprivation remedy exists. Hudson, 468 U.S. at 533. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); *see also* Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Thus, the appropriate forum for the plaintiff's claim regarding the loss of property in this incident lies in state court or in the administrative procedures of TDCJ rather than federal court. Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987). His claim on this point is without merit.

### III. The Confiscation by Officer Russell

White says that Officer Russell came and took his property on March 3, 2003, pursuant to orders by Major Fox. White testified at the Spears hearing that at this time, he lost his trial transcripts, and never had them returned.

White stated that he was working on his conviction, seeking an out-of-time appeal. Court records show that on July 8, 1992, the Ninth Court of Appeals in Beaumont handed down a decision dismissing an out-of-time appeal as improvidently granted. That Court said that among the plea documents was an instrument entitled "waiver of right to appeal." This waiver showed that White understood that he had a right to appeal, that the punishment of the court did not exceed the punishment which he expected to receive in connection with the plea bargain, and that he waives and abandons his right to appeal in the case.

On January 11, 1991, the appellate court issued an order granting a motion for out of time appeal. This motion did not dispute the fact that the trial court had followed the punishment recommendation, but argued that he was never advised of his right to appeal rulings made on pre-trial issues, but that on the contrary, he was advised that he could not appeal; White argued that this advice was in error because he did not waive his right to appeal the rulings on his pre-trial motions.

The Court of Appeals, in determining that this motion was granted improvidently, stated that there was no evidence in the record to support White's assertion that he was given any advice by counsel regarding his appellate rights, but that instead, the record showed that White was fully admonished of his rights prior to his guilty plea. The trial court told White that if the punishment

assessed did not exceed the recommendation, he could not appeal without permission from the trial court. The appeals court therefore concluded that White had validly waived and abandoned his right to appeal, and that there was no evidence to support White's contentions that he was never advised of his right; the court further concluded that White's waiver of appeal included his right to appeal rulings on pre-trial motions. *See* White v. State, 833 S.W.2d 339 (Tex.App.-Beaumont 1992, *pet. ref'd*), *cert. denied* White v. Texas, 507 U.S. 936, 113 S.Ct. 1327 (1993). White also indicated that he has sought habeas corpus relief in state court, to no avail.

Inmates have a general right of access to legal materials, but this right is simply an offshoot of the right of access to court, because the Court's main concern is protecting the ability of the inmate to prepare a petition or complaint. Mann v. Smith, 796 F.2d 79, 83 (5th Cir. 1986). The Supreme Court has held that the right of access to court does not "guarantee inmates the wherewithal to transform themselves into litigating engines." Lewis v. Casey, 116 S.Ct. 2174, 2182 (1996). Specifically, the Court stated that there is no right to file frivolous lawsuits and that depriving an inmate of the opportunity to file frivolous pleadings takes away nothing except the possibility of Rule 11 sanctions. Lewis, 116 S.Ct. at 2181 n.3.

In this case, White stated that he wished to file a motion for an out-of-time appeal, despite the fact that his previous request for an out-of-time appeal was dismissed as improvidently granted over a decade ago, with the Texas Court of Criminal Appeals and the U.S. Supreme Court both denying discretionary review of this dismissal. He acknowledged that his habeas corpus challenge to this conviction has also been denied. White testified that he wished to argue that his waiver of his appellate rights was "invalid" because the document recited that it had been signed in open court but it had not been, a claim with little or no chance of success,[4] and that he did not understand his rights, a claim which the Ninth Court of Appeals has already rejected. White has failed to show that

---

[4] Research has failed to disclose any prior case in the State of Texas where such an argument was successful.

he has been denied any meaningful access to court through the loss of his trial transcript, and so his claim on this point is without merit.

To the extent that White lost other property besides his trial transcript in this incident, he has not shown that any such loss denied him access to court or otherwise implicated and constitutional protections. As above, the appropriate forum for these claims is in state court or in the administrative procedures of TDCJ rather than federal court. Simmons v. Poppell, 837 F.2d at 1244. White's claim on this point is without merit.

### IV. White's Classification

White complains that Beverly Fox and Warden Thompson removed him from safekeeping after he received his disciplinary case. As a general rule, inmates do not have a protected liberty interest in their custodial classification. Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992). The Fifth Circuit has stated that the classification of inmates is typically relegated to the broad discretion of prison officials and is a matter with which the courts are reluctant to interfere except in extreme circumstances. Mikeska v. Collins, 900 F.2d 833, 836 (5th Cir. 1990), *modified on rehearing* 928 F.2d 126 (5th Cir. 1991).

Information from prison records shows that in February of 2003, a request was made that White be removed from safekeeping status. The request noted that information gained from various investigations showed that White was "heavily involved" in drugs, tobacco, and currency at the Michael Unit and that he appeared to be more of a predator than a potential victim. Another message, dated in March of 2003, stated that White's safekeeping status was deleted after his extortion conviction due to his "obvious predator traits" and that investigations revealed that he had constructed a sophisticated scheme of trafficking in tobacco. White had inmates wishing to purchase tobacco send money to his parent, who then wrote to White and said, in code, that they had received the money; at that time, White made arrangements for the tobacco to be picked up.

The message stated that the network which White had set up was extremely difficult to track and harder to substantiate with verifiable evidence, because White takes every precaution to avoid

handling the tobacco himself; however, interviews with other inmates confirmed that White is a "central contact" for tobacco trafficking. Consequently, a transfer was recommended for White, and he was duly sent to Darrington.

To the extent that White alleges that his removal from safekeeping amounted to deliberate indifference to his safety, this claim is plainly untenable. As White conceded, the disciplinary case by itself provided sufficient basis to remove him from safekeeping. The information turned up in the prison investigations simply provided additional grounds for this decision.

The Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994). Thus, the state of mind of the prison officials is a relevant factor in the inquiry. Horton v. Cockrell, 70 F.3d 397, 401 (5th Cir. 1995).

In this case, White has wholly failed to show that his removal from safekeeping was the result of deliberate indifference to his safety, rather than a response to the disciplinary case which he received for extortion, combined with the information which was before the officials as a result of the investigations into his other activity. This claim is without merit.

### V. Loss of his Grievance

White complains that Officers Pate, Kirkpatrick, and Different are unit grievance investigators at the Michael Unit. He stated initially that his Step One grievance appealing the extortion case was "stolen," but then conceded that he got it back, albeit without the attachments. He indicated that this was done by one of these three officers.

In his complaint, White says that he sent the original record which he received from his disciplinary hearing, the one with the blank spaces on it, home to be copied, and once he got the copies, he filed two appeals of the case. When he got his grievances back, however, his copies were gone, and they had been replaced by the documents on which the blanks had been filled in. His appeal was then denied based upon the "fraudulent" document.

Assuming the truth of White's assertion that he received a hearing record with blank spaces on it, this could violate prison disciplinary rules, which specify that at the conclusion of the hearing, the inmate is supposed to get a written record, including the reasons for the exclusion of evidence and witnesses and the reason for the determination of guilt. *See* TDCJ-CID Disciplinary Rules and Procedures for Inmates, sec. VI.E.

However, the Fifth Circuit has made clear that a violation of prison rules alone is not sufficient to rise to the standards of a constitutional claim. Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996); Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986). In this case, White has failed to show that he suffered a constitutional violation in the fact that he did not get a complete copy of the hearing record until several weeks later. He was able to challenge the disciplinary case on appeal through the grievance procedure, raising his complaints that witnesses and evidence were denied to him. He has not shown a constitutional violation and so his claim on this point is without merit.

### VI. Retaliation and Conspiracy

White alleges that the actions against him complained of in this lawsuit were the result of retaliation against him. As a general rule, a prisoner who asserts a retaliation claim must assert specific facts; mere conclusory allegations are not enough. Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988).

In Jones v. Greninger, 188 F.3d 322 (5th Cir. 1999), the Fifth Circuit expressed the law as follows:

> To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.

Jones, 188 F.3d at 325-26.  The Court went on to note that if the inmate was unable to point to a specific constitutional right that was violated, the claim would fail.  Furthermore, the relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In the present case, White asserts that the disciplinary case which he received for extortion, and his subsequent removal from safekeeping, were the result of retaliation for the large number of grievances and lawsuits which he had filed.  He did not offer any specific link between his legal activity and the disciplinary case which he received, beyond the fact that he engaged in legal activity and subsequently received the disciplinary case.

The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves." Woods, 60 F.3d at 1166; *accord*, Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform.").  As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance.  Orebaugh, 910 F.3d at 528.

16

Here, White has failed to show that the defendants had a specific intent to retaliate against him for his legal activity. The Fifth Circuit has noted that the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. Woods, 60 F.3d at 1166. White offers neither of these, but simply the speculation that the incidents must have happened as a result of retaliation and the fact that the disciplinary case came later in time than his legal activity. The mere fact that one incident precedes another is not proof of a causal connection; this is the logical fallacy of post hoc ergo propter hoc (after this, therefore on account of this). *See* Tampa Times Co. v. National Labor Relations Board, 193 F.2d 582 (5th Cir. 1952) (post hoc ergo propter hoc is not sound logic). The plaintiff's claims of retaliation are based on this fallacy and thus insufficient to state a constitutional claim. *See* Moody, 857 F.2d at 258.

White also alleges that various individuals, including inmate Castillo, conspired against him. The Fifth Circuit has held that to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984). In addition, persons claiming a conspiracy must state specific facts, not mere conclusory allegations. Hale v. Harney, 786 F.2d 688, 690 (5th Cir. 1986). In pleading these specific facts, the Plaintiff must allege the operative facts of the alleged conspiracy. Lynch v. Cannatella, 810 F.2d 1363, 1369-70 (5th Cir. 1987). Because White has not set out specific facts showing a conspiracy nor shown the deprivation of a constitutional right, his conspiracy claim must fail.

### VII. The "Continuing Tort" Claim

At the Spears hearing, White said that he wanted to raise a claim of an "on-going continuous tort," specifically concerning the conditions of confinement at the Eastham Unit, where he is currently housed; specifically, the fact that the Eastham Unit had no dishwashers and so the eating implements and utensils are not properly cleaned. In essence, he said that the extortion claim and the removal from safekeeping resulted in his transfer from the Michael Unit, and thus subjected him

17

to the conditions of confinement at Eastham, so there is an "on-going continuous tort" relating back to the disciplinary case and removal from safekeeping.

Under Texas law, the theory of an on-going continuous tort is found as an exception to the statute of limitations: where a defendant's tortious conduct and a plaintiff's injuries are on-going and continuous, the statute of limitations only begins to run when the tortious conduct ceases. Mitchell Energy Co. v. Bartlett, 958 S.W.2d 430, 443 (Tex.App.-Fort Worth 1997, pet. denied). It does not represent a cause of action, nor a vehicle to raise multiple claims in a single lawsuit. The statute of limitations is not at issue in this case, and so White's claim on this point is without merit.

White conceded at the Spears hearing that he had not yet exhausted his administrative remedies on the claims regarding the conditions of confinement at Eastham, so these claims are not properly brought in this lawsuit. Underwood v. Wilson, 151 F.3d 292, 296 (5th Cir. 1998). To the extent that White sought to use his theory of an "on-going continuous tort" as a measure of damages, rather than as a separate cause of action in this lawsuit, the claim must fail because any damages suffered as a result of the lack of dishwashers at Eastham could not reasonably be foreseen as the result of a disciplinary case received over two years earlier at the Michael Unit. *See generally* Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854); *compare* Downey v. Denton County, 119 F.3d 381, 389 (5th Cir. 1997) (injury which directly and immediately resulted from negligence was reasonably foreseeable despite the defense's claim of an intervening cause). White's claim on this point is without merit.

## VIII. The Claims at the Darrington Unit

White named a number of Defendants at the Darrington Unit and raised a number of claims over incidents occurring there, including claims of failure to protect and excessive use of force. The Darrington Unit is outside of the territorial jurisdiction of the Eastern District of Texas, being located within the Southern District of Texas. Venue against the claims and defendants at the Darrington Unit is improper in the Eastern District of Texas, and so these claims should be severed from the

lawsuit and transferred to the court of appropriate venue. 28 U.S.C. §1404; Balawajder v. Scott, 160 F.3d 1066, 1067 (5th Cir. 1998).

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, White's claims in the Eastern District of Texas lack any arguable basis in law and fail to state a claim upon which relief may be granted in federal court.  These claims may be dismissed as frivolous.  His remaining claims should be severed and transferred to the U.S. District Court for the Southern District of Texas, the court of appropriate jurisdiction and venue.  It is accordingly

ORDERED that the Plaintiff's claims against Ronald Fox, Lt., Woods, P. Jones, Roy Castillo, Robert Taylor, Counsel Substitute Ham, Beverly Fox, Richard Thompson, Carroll Russell, Anthony Holmes, James Pate, Pamela Kirkpatrick, and Sharon Different are hereby DISMISSED with prejudice as frivolous.  All claims arising at the Michael Unit are hereby DISMISSED with prejudice as frivolous.  It is further

ORDERED that all remaining claims and defendants in this lawsuit, comprising the claims which arose at the Darrington Unit, are hereby SEVERED from this lawsuit and such severed claims are TRANSFERRED to the United States District Court for the Southern District of Texas, Galveston Division, for such other and further proceedings as that Court may deem appropriate. Finally, it is hereby

ORDERED that any and all motions which may be pending in this action are hereby DENIED.

So **ORDERED** and **SIGNED** this **8** day of **September, 2005.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE